**Exhibit "A"**

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

    *Plaintiff-Appellee,*

*v.*

MELVIN E. DAVIS,

    *Defendant-Appellant.*

Nos. 06-5883/6235

---

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 05-00112—Thomas A. Varlan, District Judge.

Argued: September 18, 2007

Decided and Filed: January 30, 2008

Before: MOORE and GRIFFIN, Circuit Judges; TARNOW, District Judge.[*]

---

## COUNSEL

**ARGUED:** Christopher J. Oldham, GULLEY OLDHAM, Knoxville, Tennessee, for Appellant. Steve H. Cook, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Christopher J. Oldham, GULLEY OLDHAM, Knoxville, Tennessee, for Appellant. Steve H. Cook, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee.

---

## OPINION

---

    KAREN NELSON MOORE, Circuit Judge. A jury found Defendant-Appellant Melvin Eugene Davis ("Davis") guilty of possession with intent to distribute cocaine base, in violation of 21 U.S.C. § 841(a)(1), and possession with intent to distribute cocaine base within 1,000 feet of a public school, in violation of 21 U.S.C. §§ 860(a), 841(a)(1), and 841(b)(1)(C). The district court sentenced Davis to imprisonment for 240 months and 262 months, respectively; the district court determined that the terms would run concurrently. On appeal, Davis argues that the district court erred by denying his motion to suppress drugs found during his arrests on March 9, 2005 and August 24, 2005. Also, he appeals the district court's denial of his motion to exclude two expert witnesses at his trial, and the denial of his motion for a mistrial based on prosecutorial misconduct. Finally, for the first time on appeal, Davis objects to three statements made by the government during trial,

---

[*]The Honorable Arthur J. Tarnow, United States District Judge for the Eastern District of Michigan, sitting by designation.

which he alleges constitute prosecutorial misconduct. For the following reasons, we **AFFIRM** the district court's judgment.

## I. BACKGROUND

Investigator Todd Gilreath ("Gilreath") of the Knoxville City Police Department serves in the Organized Crime unit and is assigned to the Federal Bureau of Investigation's Violent Crimes or Safe Streets Task Force. In the course of Gilreath's work, informants indicated that Davis engaged in illegal drug activities. Before his current assignment, Gilreath came to know Davis during the four years that Gilreath was part of the Patrol Division of the Knoxville Police Department; he spent a great deal of time in the Walter P. Taylor Housing Development where Davis lived with his mother, Vanessa Tate. Gilreath knew Davis as "Melvin Tate," "Little Melvin," "Melvin Davis," and later as "Agu" or "Ragu." Joint Appendix ("J.A.") at 669 (Suppression Hr'g Tr., Gilreath Test. at 7:8-16). Also, Gilreath guarded Davis periodically while he received treatment in the hospital after being shot in the abdomen. Although Gilreath knew that Davis used other names, Gilreath testified that he assumed (before March 9, 2005) that "Tate" was Davis's legal surname. J.A. at 673 (*id*. at 11:9-17).

**A. March 9, 2005 Arrest**

On March 9, 2005, Gilreath and Lieutenant Mark Fortner ("Fortner") of the Knoxville Police Department received a call from a confidential informant. The informant stated that Davis was "posted up" on the 2500 block of Martin Luther King Boulevard ("2500 block"), not far from where the officers were positioned. J.A. at 680 (*id*. at 18:1-2). As described by Gilreath, "posted up" means that a street-level crack dealer stands in a particular area so that he or she can be approached by buyers. J.A. at 680 (*id*. at 18:5-15). Gilreath knew the 2500 block to be a high crime area; previously, he had conducted three raids on three different businesses there.

Gilreath and Fortner proceeded to the area described by the informant and observed Davis standing between 2525 and 2527 Martin Luther King Boulevard. Gilreath and Fortner parked in the Holiday Market parking lot; from this vantage point, they could see Davis standing in the 2500 block. Twenty to twenty-five minutes after the officers began their surveillance, Davis entered a light blue Nissan Maxima; Davis drove to the Bi-Lo Market, approximately three blocks from where he had been standing. Gilreath and Fortner followed him and parked directly behind the Bi-Lo so that they could see Davis's car, at which point Gilreath called the Organized Crime Office to determine if Davis had a valid driver's license. Gilreath testified that "[t]he request was for anybody under the last name of Tate with a date of birth of 2-7-1980." J.A. at 687 (*id*. at 25:5-6). Although Gilreath did not have the exact date of birth for Davis, Gilreath thought that it was during the year 1980; when the officer conducting the computer search indicated that there was a "Tate" with a date of birth of February 7, 1980 on file, Gilreath said, "that has got to be it." J.A. at 687-88 (*id*. at 25:17-26:4). The check revealed that there was no driver's license on file for an individual with the surname "Tate" and a date of birth of February 7, 1980.

After receiving the license information, Gilreath observed Davis enter the Maxima again; Davis drove by Gilreath and Fortner, and the pair followed him. Gilreath radioed for a marked car because he did not have blue lights or a siren; however, before the marked car arrived, Davis pulled into a barbershop parking lot, exited his car, and moved towards the entrance of the establishment. Gilreath testified:

> I would describe it as quickly moved to the front door. I yelled for him, "hey, Melvin, come here." He looked back and continued to step through the threshold of the door. I was literally on his heels. I stepped through the door right behind him. I said, hey, come here I need to talk to you for a minute. He stepped outside . . . ."

J.A. at 692 (*id*. at 30:2-8). When asked if he had a driver's license, Davis told Gilreath that he did not have one. In addition, Gilreath noticed that there were bits of what appeared to be marijuana stuck to the thighs and abdomen area of Davis's pants. Gilreath placed Davis under arrest. During the search incident to arrest, Fortner found crack cocaine in Davis's sock.

Gilreath had Davis's vehicle towed and read Davis his *Miranda* rights in the car on the way to the Organized Crime Unit at the Knoxville Police Department. Gilreath indicated that after he read the last sentence on his card that stated the *Miranda* rights ("Having these rights in mind, do you wish to talk to me now?"), Davis stated that he "want[ed] a chance to help [him]self." J.A. at 699 (*id*. at 37:2-10). After talking with Special Agent David Bukowski ("Bukowski") of the Federal Bureau of Investigation ("FBI") and with the United States Attorney's office, Gilreath testified that "[t]he decision was made that [Davis] could definitely help himself, as far as working, and he could provide substantial assistance against other drug dealers and violent criminals in that area." J.A. at 701 (*id*. at 39:11-15). Davis became a "confidential source" for the FBI and Knoxville Police Department. *Id*. (*id*. at 39:20-22).

During the interview at the police station, Davis told Gilreath that his true, legal name was "Melvin Davis." J.A. at 702 (*id*. at 40:9-11). A license check under this name revealed that Davis's license had been suspended.

**B. August 24, 2005 Arrest**

Bukowski and Gilreath's offices adjoined, and they continued to stay in contact with each other and with Davis after March 9, 2005. Gilreath testified that the officers "constantly" asked Davis if he had obtained his driver's license. J.A. at 704-05 (*id*. at 42:25- 43:4). Also, Gilreath testified that Davis indicated that it was going to cost "a tremendous amount of money." J.A. at 705 (*id*. at 43:7-8). "[H]e asked us if we could help him get his license reinstated, maybe put him on a deal so he could actually be paid for some of the work that he was doing in order to help obtain some money to get his driver's license status." J.A. at 705 (*id*. at 43:8-12).

About one week before August 24, 2005, Gilreath received information that Davis was "starting to get back into the business." J.A. at 706 (*id*. at 44:16). On the morning of August 24, 2005, a reliable, confidential informant called Gilreath to tell him that Davis was on the same 2500 block smoking marijuana in a black Jeep Cherokee; as Gilreath and Sergeant Brian Malone ("Malone") proceeded to the location in an unmarked car, Gilreath received another phone call from the same source stating that Davis was there with two "young girls." J.A. at 707-08 (*id*. at 45:2-25, 46:21-24). Davis pulled out of the parking lot and the officers followed him; they observed Davis driving the vehicle and two females who "appeared to be juveniles" in the front and rear passenger seats. J.A. at 709-710 (*id*. at 47:19-48:1). Although they had not run Davis's name through the database to determine if he had obtained a valid license, Malone requested a marked car in order to do a traffic stop; Gilreath and Malone did not have the necessary equipment for such a traffic stop. Gilreath testified that they "could see an exchange between the two people in the front seat of the vehicle"; Malone also requested a female officer for a search. J.A. at 710 (*id*. at 48:9-21).

When Davis pulled the vehicle into the student drop-off section of the Austin East High School, Gilreath and Malone "pulled right directly in behind him." J.A. at 711 (*id*. at 49:7). Gilreath went to the passenger side and Malone went to the driver's side; Gilreath testified that Malone asked Davis if he had a license and Davis stated that he did not have one. Gilreath smelled the odor of marijuana coming from the vehicle and saw some marijuana on the Jeep's console. Gilreath asked the young woman in the front passenger seat, "[D]o you have anything on you?" J.A. at 713 (*id*. at 51:7). Gilreath testified that the young woman, later identified as Ranisha Ewing ("Ewing"), stated that Davis had given her something to hold onto; she opened her purse to reveal a baggie of crack cocaine. The officers then placed Davis under arrest.

**C. Motion to Exclude Expert Testimony of Forensic Chemists at Trial**

The government sought to introduce the expert testimony of two forensic chemists: Sharon Silvers and Celeste White. The court's "Order on Discovery and Scheduling" directed as follows: "Unless otherwise ordered by the Court, any disclosure of expert information required by Rule 16(a)(1)(G), Fed.R.Cr.P., shall be made by the government at least three (3) weeks before trial. Any disclosures required by Rule 16(b)(1)(C) shall be made by defendant at least one (1) week before trial unless the Court orders otherwise." J.A. at 43 (10/3/05 Order at 3). The district court instructed the parties that all pre-trial motions had to be made by March 10, 2006. On the second day of trial, defense counsel objected to the testimony of the chemists because the government allegedly failed to provide the bases for the chemists' opinions in accordance with the Discovery Order and Federal Rule of Criminal Procedure 16(a)(1)(G). Defense counsel stated:

> The problem is that all I got from the government in this case[,] all I received, Your Honor, about this is a document that looks like this which is a conclusory document. It says here is what it is and here is what it weighs. None of the underlying tests that tell me how they got there. Mind you, Rule 16 not only says that I am entitled to a summary, but that summary provided under this subparagraph must describe the witness' [sic] opinions, the basis and the reasons for those opinions and the witness' [sic] qualifications. This certainly does none of the above, Your Honor. . . . Just because I have been provided with a report that says it is cocaine and that there is 3.8 grams of it doesn't mean that has given me sufficient information to cross-examine this witness.

J.A. at 358-59 (Trial Tr. at 223:11-21, 224:6-10).

Defense counsel showed the district court two letters, one dated March 2, 2005 and one dated March 6, 2005, that he contended specifically asked for information necessary for the government to be in compliance with Rule 16(a)(1)(G). J.A. at 357 (*id.* at 222:8-17). These letters were mistakenly dated 2005; the actual year was 2006. The letter, addressed to Assistant United States Attorney Cook ("Cook") of March 2 states, in relevant part: "By this letter, please be advised that I am requesting that you provide me with a written summary of any testimony that you intend to use under Rules 702, 703, or 705 of the Federal Rules of Evidence. I believe that this information is covered under the Standing Discovery Order and under my previous discovery request." J.A. at 810 (3/2/06 Ltr. to AUSA Cook). On March 6, defense counsel sent another letter to Cook, stating in relevant part:

> As I was going through my file, I noticed that I had not received an item that I had previously requested regarding a 16(a)(1) item, specifically:
>
> "The reports, results, and opinions of expert examinations, tests, experiments and analysis done on any person or physical items or other evidence in connection with this case. *See Barbee v. Warden of Maryland Penitentiary*, 331 F.2d 842 (4th Cir. 1964); *Norris v. Slayton*, 540 F.2d 1241 (4th Cir. 1976)."
>
> If you could get this information over to me at your earliest convenience, it would be greatly appreciated. If you did not consider my previous requests to be formal requests, please consider this request to be a formal request.

J.A. at 811 (3/6/06 Ltr. to AUSA Cook). Defense counsel argued that he not only had written the letters, but also had raised the issue on several occasions with the presiding magistrate judge:

> Your Honor, mind you, during this entire time we have gone back before Magistrate Shirley on several occasions. At each time I, quite frankly, get chewed out a little

bit because Magistrate Shirley keeps telling me, Mr. Oldham, this is the government's obligation. The government knows what it is supposed to provide. The government is supposed to get you this information and their failure to do so is done at their own peril with the possibility this evidence might be excluded, if they fail to disclose it properly.

J.A. at 357-58 (Trial Tr. at 222:8-223:2). Defense counsel suggested that the proper remedy was to "exclude these witnesses from testifying." J.A. at 360 (*id*. at 225:12).

Cook argued that the disclosure he provided in this case was "the same disclosure" that he had "made in every drug case" that he had "prosecuted for the last 20 years." J.A. at 361 (*id*. at 226:3-7). The government introduced its first discovery letter, dated October 11, 2005, that it sent to Davis's original counsel, Paula Voss. The letter indicated that its purpose was to "comply with rule 16 of the Federal Rules of Criminal Procedure and the Court's discovery order." J.A. at 99 (10/11/05 Ltr. to Paula Voss at 1). The letter included a copy of the "Tennessee Bureau of Investigation Knoxville Crime Laboratory Official Forensic Chemistry Report dated 8/19/05." J.A. at 99 (*id*.). Also, the letter stated: "If this case goes to trial, the United States will call expert witnesses to testify. A chemist will testify consistent with the laboratory report. The chemist's testimony will be based on training, including formal education, and experience, including having conducted numerous such examinations." J.A. at 100 (*id*. at 2). The government sent a follow-up letter on October 26, 2005 that stated, in relevant part: "If you believe I have failed to provide anything that is discoverable under rule 16 of the Federal Rules of Criminal Procedure or the Court's discovery order, please let me know right away." J.A. at 102-03 (10/26/05 Ltr. to Christopher Oldham at 1-2).

Finally, the government introduced a letter from March 22, 2006, which stated in relevant part: "If there are any other discovery requests or issues that have not been resolved, please let me know immediately. . . . Please also accept this letter as a request to stipulate the drug analysis." J.A. at 105. On March 28, 2006, the government filed its "Notice of Expert Testimony Pursuant to Rule 16 of the Federal Rules of Criminal Procedure." J.A. at 93-95. This document stated, in relevant part:

> *Chemists*: These individuals have received bachelor's degrees. In addition, they have received specialized training in the identification of controlled substances. They have also conducted hundreds of forensic examinations, successfully identifying the presence, type and weight of controlled substances. These individuals will testify as experts in the field of forensic chemistry consistent with the laboratory reports that have previously been provided. The findings of each chemist are based upon his/her education, training, experience and scientific tests he/she performed on the substances submitted.[1]

J.A. at 94-95 (Notice of Expert Test. at 2-3).

The district court held that the documents provided by the government (and described above) demonstrated compliance with Rule 16(a)(1)(G). In addition, the district court ruled that it would be inappropriate to exclude the testimony of the chemists as a remedy. However, "out of an abundance of caution," the district court requested that the chemists provide their notes to defense counsel. J.A. at 374-75 (Trial Tr. at 239:4, 240:6-9). Defense counsel protested that he did not

---

[1] Chemist Silvers testified that she had "never" turned over her notes for discovery purposes, and that the prosecutor in this case had never asked her for the notes until the second day of trial (after the district judge asked the prosecutor to determine if the chemist had brought her notes with her so that she could share them with defense counsel). J.A. at 473 (Trial Tr. at 338:9-24).

"have the training to look at" the notes. J.A. at 375 (*id.* at 240:17-18). Defense counsel stated: "Your Honor, I mean, this is what I am looking at; wavy numbers, centimeters. I don't even know what questions to ask, Your Honor." J.A. at 375 (*id.* at 240:20-22). The court specifically asked: "Do you have any other proposals short of the requested sanctions you made [to exclude the chemists' testimony completely]?" J.A. at 375 (*id.* at 240:23-24). Davis's counsel did not bring forth any other proposals and declined the court's invitation to recess until the following day. The record does not indicate that defense counsel had a chemist prepared to testify at the trial.

### D. Prosecutorial Misconduct

#### 1. Objection During Trial to Alleged Prosecutorial Misconduct

During the trial, defense counsel asked Gilreath at least four times whether Ewing (one of the young women in Davis's Jeep before his arrest on August 24, 2005) had been charged, or would be charged, in connection with the events at issue on August 24, 2005;[2] each time defense counsel received the same or similar answers. After this series of questions, Cook stated that he would stipulate to the fact that there was no prosecution of Ewing. The following exchange occurred:

| | |
|---|---|
| THE COURT: | You still want to ask the question? |
| MR. OLDHAM: | I think Mr. Cook just answered it for me. |
| THE COURT: | Go on to the next question. |
| MR. OLDHAM: | Perhaps Mr. Cook can answer this one too. Is anyone prosecuting Ms. Geisha Bolden, the other girl in the car? |
| MR. COOK: | We don't prosecute innocent people. Irrelevant. |
| MR. OLDHAM: | Objection. Your Honor, I want to move for mistrial based on that comment right there. That is improper. He is trying to influence the jury improperly. |

J.A. at 270 (Trial Tr. at 135:12-25).

#### 2. Three Instances of Alleged Prosecutorial Misconduct Raised For the First Time on Appeal

Davis raises three instances of alleged prosecutorial misconduct to which his defense counsel did not object during the trial. First, Davis objects to statements in closing argument made regarding Ewing, one of the occupants of his car on August 24, 2005. Assistant United States Attorney Plowell ("Plowell") stated:

---

[2] Q.  What was Ms. Ewing charged with?
A.  Nothing at this time.
J.A. at 265 (Trial Tr., Gilreath Test. 130:3-4).
Q.  We have gone eight months and she has not picked up a charge?
A.  That is correct.
J.A. at 265 (*id.* at 130:23-25).
Q.  And you would be aware of it [a pending prosecution of Ewing], if it occurred?
A.  I would think so.
J.A. at 266 (*id.* at 131:3-4).
Q.  To the best of your knowledge, who is handling anything going on from your—if you know, who is handling the prosecution or potential prosecution of Ms. Ewing? Do you know who that is?
MR. COOK:  Objection. Asked and answered. There is no prosecution. It has been established and covered and covered and covered.
MR. OLDHAM:  That is sort of what I wanted to get to.
MR. COOK:  No question about it. I will stipulate to it.
J.A. at 270 (*id.* at 135:1-11).

> She is also young, unsophisticated, notwithstanding her appearance. I submit to you, ladies and gentlemen, she is very easily confused. She was scared. She told you the defendant was giving her mean looks when she was testifying, the kind of thing that as adults we would likely ignore, but still the kind of thing that frightens a 16 year old, I submit to you.
>
> She didn't even know her own lawyer's last name. When the defense asked her if she knew Mr. Poston, she said, no. Because she clearly knows him, but she knows him as Bruce. Does that make her less worthy of belief, ladies and gentlemen? I submit to you, it doesn't. She was asked if she had a deal with the government. Initially she says, yeah, I have a deal. Later she clarified. Again, she was confused, she was mistaken. There was no deal. That was further confirmed by her attorney Bruce Poston, no deals.
>
> The defendant I expect will argue she is getting some sort of benefit for not being prosecuted because of her testimony, but, ladies and gentlemen, recall Mr. Poston. No deals were made. There were no promises. Why were there no deals and no promises, ladies and gentlemen? Because the credible evidence, I submit, pointed to the defendant. Does the confusion of a 16 year old make her less worthy of belief? Don't we all get confused some of the time? Of course, we do. We are people, we are not robots. Ranisha corrected her misstatements when she was given the opportunity to do so. Those are hallmarks of her credibility.

J.A. at 816-17 (Trial Tr., Gov't Closing Arg. at 24:7-25:10).

Second, Davis objects to Cook's statement during closing argument that Fortner and Gilreath "are sworn dedicated public servants who serve our community every day and risk their lives every day to serve us. To have him come into this courtroom without a shred of evidence and suggest to you, to suggest to you that they lied, to suggest to you they fabricated evidence and to suggest to you that their work was shoddy is wholly unfounded and offensive, as I said." J.A. at 819 (*id.* at 47:1-8).

Finally, Davis objects to Cook's statements during closing argument regarding Ewing and Davis:

> Ladies and gentlemen, one of those two people, Ranisha or Melvin Davis, one of those two is an immature adult, immature in an adult body who was being taken advantage of. The other one is a predator who was selling poison in our community. I want to remind you that it's your job to make credibility determinations. It is your job to determine who is telling the truth.

J.A. at 821 (*id.* at 52:6-12).

### E. Procedural Background

Davis was indicted on September 20, 2005 on one count of possession with intent to distribute cocaine base in violation of 21 U.S.C. §§ 841(a)(1) and 841(B)(1)(C). On October 18, 2005, a superseding indictment added a second count: possession with intent to distribute cocaine base "on and within 1,000 feet of the real property comprising Austin East High School, a public secondary school" in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 860. J.A. at 22 (Superseding Indictment). The magistrate judge issued an order regarding discovery and scheduling on October 3, 2005. On October 31, 2005, Davis filed a motion to suppress evidence related to his arrests on March 9, 2005 and August 24, 2005. The magistrate judge held a hearing on December 16, 2005, at which the court heard testimony from Investigator Todd Gilreath, Vanessa Tate (Davis's mother), Melvin Davis (Davis's father), and Davis. The magistrate judge issued a Report and

Recommendation recommending denial of the motion to suppress. Although Davis filed objections to the Report and Recommendation, the district judge issued an opinion adopting the recommendations of the magistrate judge.

On March 28, 2006, the government filed a "Notice of Expert Testimony Pursuant to Rule 16 of the Federal Rules of Criminal Procedure." J.A. at 93-95. The district court held a jury trial from April 18 to April 20, 2006. During trial, Davis moved for a mistrial based on the statement of Cook that the government did not prosecute "innocent people." J.A. at 270 (Trial Tr. at 135:20-25). Davis renewed this motion on May 1, 2006; the district court denied the motion on June 27, 2006.

## II. MOTION TO SUPPRESS

### A. Standard of Review

When reviewing a district court's decision on a motion to suppress, we use a mixed standard of review: we review findings of fact for clear error and conclusions of law de novo. *United States v. Foster*, 376 F.3d 577, 583 (6th Cir.), *cert. denied*, 543 U.S. 1012 (2004). We review the evidence "in the light most likely to support the district court's decision." *Id.* (quoting *United States v. Navarro-Camacho*, 186 F.3d 701, 705 (6th Cir.1999)).

### B. Applicable Search and Seizure Law

Police and citizens may have three types of permissible encounters: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir. 2000) (quoting *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997)). In the first type of encounter, law enforcement officers may ask citizens "general questions without having any reasonable suspicion of criminal activity, so long as the officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that the person was not free to leave." *Id.* at 603; *see Foster*, 376 F.3d at 584. "Whether an encounter between a police officer and a citizen is consensual depends on the officer's objective behavior, not on any subjective suspicion of criminal activity." *Waldon*, 206 F.3d at 603.

The second type of encounter follows the framework of *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny. "*Terry* . . . permits a police officer briefly to detain a person or property for investigative purposes if the officer has a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (citing *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 543-44 (6th Cir. 2002)). We engage in a two-part analysis when evaluating the constitutionality of a *Terry* stop. First, we determine "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion." *Id.* (quoting *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993)). We examine the totality of the circumstances in order "to determine the reasonableness of the investigatory stop." *Id.* (citing *United States v. Bailey*, 302 F.3d 652, 658 (6th Cir. 2002)). We may take into consideration the crime level of the area as a "contextual consideration[]." *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). Also, tips from reliable informants may be used as the basis for a *Terry* stop. *Adams v. Williams*, 407 U.S. 143, 147 (1972) ("[W]e reject respondent's argument that reasonable cause for a stop and frisk can only be based on the officer's personal observation, rather than on information supplied by another person.").

Second, we examine "whether the degree of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Davis*, 430 F.3d at 354 (quoting *Garza*,

10 F.3d at 1245). Thus, we must determine (1) if the detention was "sufficiently limited in time" and (2) if "the investigative means used the least intrusive means reasonably available." *Id.* (quoting *Bennett v. City of Eastpointe*, 410 F.3d 810, 825-26 (6th Cir. 2005)).

**C. March 9, 2005 Arrest**

The district court analyzed the interaction between Gilreath and Davis on March 9, 2005 under two frameworks: (1) a reasonable, articulable suspicion under *Terry* and its progeny, and (2) a consensual encounter that led Gilreath to develop probable cause. Under each framework, the district court denied the motion to suppress the drugs found on Davis's person. Davis argues that "[a] driver's license inquiry only on the name 'Tate' which returns a 'Not on File' response is insufficient to establish reasonable suspicion or probable cause for the traffic stop." Appellant Br. at 20. In addition, Davis argues that the district court predicated its analysis on Gilreath's lack of reasonable suspicion; therefore, he argues that the district court should have concluded that the stop was unconstitutional under *Terry*. Finally, Davis argues that because Gilreath intended to arrest Davis, "there is no way that a court could conclude that the encounter was ever 'consensual' in any form that the term may be considered." Appellant Br. at 23.

We conclude that Gilreath formed a reasonable suspicion before approaching Davis on March 9, 2005. First, Gilreath obtained specific and articulable facts that gave rise to a reasonable suspicion: (1) a reliable informant indicated that Davis was "posted up" at a specific location and Gilreath observed Davis standing at that exact location for twenty to twenty-five minutes, J.A. at 680 (Suppression Hr'g Tr., Gilreath Test. at 18:1-2); (2) Davis was "posted up" in a high crime area, J.A. at 681 (*id.* at 19:4-14); and (3) a check (using what the officer believed to be Davis's last name and birth date) revealed that Davis did not have a license on file. J.A. at 688 (*id.* at 26:8-11). The totality of the circumstances indicates that Gilreath appropriately formed a reasonable suspicion.

Davis argues that the officer could not have formed a reasonable suspicion based upon the license check because he mistakenly used the surname "Tate" instead of Davis's legal surname, "Davis." Such a mistake seems reasonable given the circumstances. After years of knowing Davis, Gilreath associated him with several names (Little Melvin, Melvin Tate, Melvin Davis, Agu, and Ragu); Gilreath testified that he assumed that "Melvin Tate" was Davis's legal name. J.A. at 724, 730 (*id.* at 62:8-15, 68:15-18). Although Davis testified that he "never ever" used the name "Tate," J.A. at 770 (Suppression Hr'g Tr., Melvin Davis Test. at 108:15), and his mother testified that her son had never used the name "Tate," J.A. at 755-56 (Suppression Hr'g Tr., Vanessa Tate Test. at 93:25- 94:10), Davis's father testified that there was a "mix up" as to Davis's true last name. J.A. at 768 (Suppression Hr'g Tr., James Davis Test. at 106:9). When the prosecutor asked Davis's father about his visit with Davis a few years earlier in the hospital after Davis had been shot in the abdomen, the following exchange occurred:

> Q. Would it surprise you to find out he was using the name Tate with the police and in the news media and in the hospital?
> A. I honestly, what I thought, I thought it was a mix up of people not knowing whether his name was Tate or Davis. I didn't know if—I didn't have any idea he would change is [sic] his name. I thought it was some people is thinking he was automatically Tate because most the time he stayed with his mother. That is where I thought the mix up was.
> Q. There was a mix up?
> A. There definitely was a mix up.
> Q. No question some people misunderstood what his real name was?
> A. Yes, sir.

J.A. at 767-68 (*id*. at 105:23-106:12). To further illustrate that there was confusion about Davis's legal surname, the government introduced as its Exhibit No. SH-1 a booking photo of Davis from January 21, 1999 with the name "Melvin Eugene Tate" and a date of birth of "2-7-80." J.A. at 674 (Suppression Hr'g Tr., Gilreath Test. at 12:8-10). Davis identified this photo as one of himself, as did his mother and father. Thus, we conclude that, given the confusion about Davis's true surname, Gilreath's mistaken use of the surname "Tate" for Davis did not affect Gilreath's ability to use the results of the license check to help him form a reasonable suspicion of Davis sufficient to justify a *Terry* stop.

Regarding the second part of the *Terry*-stop analysis, we conclude that Gilreath and Fortner approached Davis in a manner reasonably related to the scope of the situation at hand. Because Gilreath did not have a blue light or siren in his car, he radioed for a marked car with citation materials; he did not conduct a traffic stop. However, before the marked car arrived, Davis pulled into a barbershop parking lot. When Davis exited his car, Gilreath exited his own car and called out to Davis: "[H]ey, Melvin, come here." J.A. at 692 (*id*. at 30:3). As Gilreath came up behind Davis Gilreath said, "[C]ome here I need to talk to you for a minute." J.A. at 692 (*id*. at 30: 6-7). Davis stepped into the parking lot with Gilreath. The detention here was extremely brief because Davis admitted that he did not have a valid license and Gilreath noticed what appeared to him to be bits of marijuana stuck to the thighs and abdomen area of Davis's pants. In addition, the investigative means used were minimally intrusive; the officer asked questions and did not have physical contact with Davis. Thus, based on the reasonable suspicion formed by the officers involved, we affirm the district court's denial of Davis's motion to suppress.

Finally, we conclude that Davis misunderstood the district court's ruling—the district court did not state that there was no reasonable suspicion in this case; rather, it gave an *alternate* holding. The district court stated: "[E]ven assuming the absence of reasonable suspicion, the Magistrate Judge concluded that Investigator Gilreath's initial contact with defendant at the barbershop was a consensual encounter." J.A. at 88 (Dist. Ct. Op. at 9). In this case, unlike *Waldon*, Gilreath indicated that he wanted to talk with Davis by using the imperative "come here," instead of asking a question. J.A. 692 (Suppression Hr'g Tr., Gilreath Test. at 30:3-7). The record on appeal does not indicate whether this phrasing may have caused Davis to feel that he was not free to leave or to refuse to respond to Gilreath—Davis did not testify as to the events of March 9, 2005 during the suppression hearing and Gilreath did not indicate in his testimony that his manner was "intimidating or coercive." *See Waldon*, 206 F.3d at 603. However, the magistrate judge found (and the district court adopted the finding) that there was no evidence that "Gilreath acted in an intimidating manner such that a reasonable person would not have felt free to leave." J.A. at 58 (R & R at 13). Because there is nothing to indicate a clear error in the findings of fact of the district court, we affirm the district court's alternate ruling; thus, the interaction between Davis and Gilreath falls within the bounds of a consensual encounter. *See Waldon*, 206 F.3d at 603.

### D. August 24, 2005 Arrest

The district court held that because the officers formed a reasonable suspicion on August 24, 2005 the motion to suppress should be denied. Davis argues that the district court erred in denying his motion to suppress the cocaine base discovered on August 24, 2005 because Gilreath relied upon "stale" information when he failed to re-run a check on Davis's driver's license status; Gilreath "could not articulate a time" when he asked Davis about the status of his license, nor did he "know if another license check had ever been performed since the March 6[sic], 2005 inquiry." Appellant Br. at 30.

We conclude that the officers' encounter with Davis on August 24, 2005 meets both parts of the *Terry* analysis; therefore, it was appropriate for the district court to deny the motion to suppress. First, Gilreath obtained specific and articulable facts that gave rise to a reasonable

suspicion: (1) a reliable informant indicated that Davis was using an illegal substance with two minors, and another informant had indicated within the past week that Davis had begun to sell illegal drugs again; (2) officers had asked Davis numerous times if he had obtained a driver's license and each time he indicated that he had not done so; and (3) Gilreath and Malone observed some type of exchange between Davis and the young woman in the passenger seat. With this knowledge, Investigator Gilreath appropriately formed a reasonable suspicion based on specific and articulable facts. In addition, as with the March 9, 2005 incident, the officers used an unobtrusive method: approaching the vehicle Davis was driving once it had parked. Upon approaching Davis, Gilreath developed probable cause for an arrest based on the marijuana in plain view on the console of the vehicle and Davis's admission that he did not have a valid driver's license. Davis does not argue that he had a reasonable expectation of privacy in the purse of the minor, Ewing, in the passenger seat of the Jeep that he drove on August 24, 2005; therefore, we need not address the government's arguments regarding the defendant's lack of a reasonable expectation of privacy in the purse. Based on the foregoing, we affirm the district court's denial of Davis's motion to suppress.

### III. MOTION TO EXCLUDE TESTIMONY OF EXPERT WITNESSES

#### A. Standard of Review

"We review the district court's admission or exclusion of evidence for an abuse of discretion." *United States v. Ganier*, 468 F.3d 920, 925 (6th Cir. 2006) (quoting *United States v. Perry*, 438 F.3d 642, 647 (6th Cir.), *cert. denied*, – U.S. – (2006)). However, "[i]n reviewing a trial court's evidentiary determinations, this court reviews *de novo* the court's conclusions of law and reviews for clear error the court's factual determinations that underpin its legal conclusions." *Id.* (quoting *United States v. Baker*, 458 F.3d 513, 516 (6th Cir. 2006) (internal quotation marks omitted)). We have held that these standards "are not in fact inconsistent, because 'it is an abuse of discretion to make errors of law or clear errors of factual determination.'" *Id.* (internal quotation omitted).

"[S]uppression of evidence must be viewed as an undesirable remedy [for a discovery violation] reserved for cases of incurable prejudice or bad faith conduct demanding punishment by the court." *United States v. Maples*, 60 F.3d 244, 247 (6th Cir. 1995). There are several factors for an appellate court to consider when "deciding whether suppression of evidence is an appropriate remedy to be imposed for a discovery violation:" "(1) the reasons for the government's delay in producing the materials, including whether it acted intentionally or in bad faith; (2) the degree of prejudice, if any, to the defendant; and (3) whether the prejudice to the defendant can be cured with a less severe course of action, such as granting a continuance or a recess." *Id.*; *see also Ganier*, 468 F.3d at 927.

#### B. Testimony of Forensic Chemists at Trial

The district court held that the government's "Notice of Expert Testimony Pursuant to Rule 16 of the Federal Rules of Criminal Procedure," filed on March 28, 2006, met the requirements of Federal Rule of Criminal Procedure 16(a)(1)(G). Davis argues that the government failed to comply with Rule 16(a)(1)(G) because it did not provide the bases for the chemists' results, something clearly required after the 1993 Amendments to the Federal Rules of Criminal Procedure. Also, Davis argues that the government was obligated to comply with the pre-trial discovery order.

Rule 16(a)(1)(G) states:

> Expert witnesses.—At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial. . . . The summary provided under this subparagraph must

> describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

FED. R. CRIM. P. 16(a)(1)(G). The Advisory Committee Notes ("Notes") for Rule 16 state in relevant part:

> [T]he requesting party is entitled to a summary of the expected testimony. This provision is intended to permit more complete pretrial preparation by the requesting party. For example, this should inform the requesting party whether the expert will be providing only background information on a particular issue or whether the witness will actually offer an opinion. In some instances, a generic description of the likely witness and that witness's qualifications may be sufficient, e.g., where a DEA laboratory chemist will testify, but it is not clear which particular chemist will be available.

FED. R. CRIM. P. 16, Advisory Committee Notes (1993 Amendment). In addition, in order to comply with Rule 16(a)(1)(G), the Notes specifically state that, "perhaps most important, the requesting party is to be provided with a summary of the bases of the expert's opinion." *Id*.

> Without regard to whether a party would be entitled to the underlying bases for expert testimony under other provisions of Rule 16, the amendment requires a summary of the bases relied upon by the expert. That should cover not only written and oral reports, tests, reports, and investigations, but any information that might be recognized as a legitimate basis for an opinion under Federal Rule of Evidence 703, including opinions of other experts.

*Id*. If a party fails to comply with this rule, Rule 16 instructs that the Court "may" do any of four things: (1) "order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;" (2) "grant a continuance;" (3) "prohibit that party from introducing the undisclosed evidence;" or (4) "enter any other order that is just under the circumstances." FED. R. CRIM. P. 16(d)(2).

We conclude that the district court incorrectly applied Rule 16(a)(1)(G) in this case because the government's submissions did not adequately describe the "bases and reasons" for the chemists' opinions. *See* FED. R. CRIM. P. 16(a)(1)(G). The government provided defense counsel with four documents. First, the government provided defense counsel with a copy of the Tennessee Bureau of Investigation Knoxville Crime Laboratory Official Forensic Chemistry Report, dated August 19, 2005. Second, the government attached a letter to the report indicating that if the case went to trial "[a] chemist [would] testify consistent with the laboratory report." J.A. at 100 (10/11/05 Ltr. to Paula Voss at 2). In addition, the letter stated that "[t]he chemist's testimony will be based on training, including formal education, and experience, including having conducted numerous such examinations." *Id*. Third, upon the addition of another count to the indictment against the defendant, the government sent a letter to defense counsel on October 26, 2005 that included a copy of a second laboratory report related to the second count.

Finally, on March 28, 2006, the government filed a "Notice of Expert Testimony Pursuant to Rule 16 of the Federal Rules of Criminal Procedure," which described, in broad terms, the educational background of the chemists, their experience, and the basis of their findings. J.A. at 94-95. This document devoted one sentence to the bases for the opinions of the chemists: "The findings of each chemist are based upon his/her education, training, experience and scientific tests he/she performed on the substances submitted." J.A. at 95. Chemist Silvers testified at the trial that the government did not ask her for her notes (serving as the basis for her conclusions) until the day

that she testified (after a request from the district judge). J.A. at 374, 473 (Trial Tr. at 239:9-16, 338:9-24).

We conclude that none of these documents adequately indicate the bases for the chemists' laboratory reports; if Davis had hired a chemist, he or she would not have been able to analyze the steps that led the government's chemists to their conclusions. The prosecutors clearly violated Rule 16(a)(1)(G). It was proper for the district court to request that the chemists provide their notes to Davis's counsel. J.A. at 374-75, 377 (*id.* at 239:4, 240:6-9, 242:3-11). However, Davis's counsel demonstrated his belief that the verdict would not have been different if the government had complied with the discovery rules by declining the district court's offer of a recess to review the newly provided chemists' notes and/or to obtain a chemist to testify on Davis's behalf. J.A. at 377 (*id.* at 242:6-13). Also, Davis did not, upon the invitation of the district court, suggest any alternatives to total suppression of the evidence. J.A. at 375-77 (*id.* at 240:23-241:1, 242:6-13). Finally, we note that, prior to trial, defense counsel should have been attuned to the implications of Federal Rule of Criminal Procedure 12(b).

## IV. PROSECUTORIAL MISCONDUCT

### A. Standard of Review

We review for abuse of discretion the district court's denial of Davis's motions for a mistrial based on prosecutorial misconduct. *United States v. Wall*, 130 F.3d 739, 745 (6th Cir. 1997).

### B. Contemporaneous Objections to Alleged Prosecutorial Misconduct

The district court held in its Memorandum & Order of June 27, 2006, addressing the renewed motion for mistrial, that Davis had offered nothing to suggest that its ruling denying a motion for mistrial made during the trial, J.A. at 286 (Trial Tr. at 151:3-21), "was legally erroneous"; therefore, it concluded, as it did during the trial, that the curative instructions to the jury removed any harm, such that a mistrial would not be necessary. J.A. at 28-29 (Dist. Ct. Op. at 6-7). Davis argues that "there were several instances of improper vouching for government witnesses," and that the government "made several statements designed to cover up the inconsistencies in the testimony of their witnesses and bolster their credibility." Appellant Br. at 36-37.

When we review claims of prosecutorial misconduct, we determine whether the prosecutor's statements were both improper and flagrant. *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006). Prosecutors should put forth only "proper arguments based on the evidence in the record." *Id.* (quoting *Bates v. Bell*, 402 F.3d 635, 641 (6th Cir.), *cert. denied*, 546 U.S. 865 (2005)). "Also, they must obey the cardinal rule that a prosecutor cannot make statements calculated to incite the passions and prejudices of the jurors." *Id.* (internal quotation marks omitted). "Finally, we have held that a prosecutor may not make improper comments 'designed to completely undercut the defendant's sole mitigation theory, effectively denying him fair jury consideration.'" *Id.* (quoting *DePew v. Anderson*, 311 F.3d 742, 749 (6th Cir. 2002), *cert. denied*, 540 U.S. 938 (2003)).

We examine four factors when determining flagrancy: "(1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant." *Id.* (quoting *Bates*, 402 F.3d at 641). "To reverse a conviction because of an improper non-flagrant statement, a reviewing court must determine that: 1) the proof of the defendant's guilt is not overwhelming; 2) the defense counsel objected; and 3) the trial court failed to cure the impropriety by failing to admonish the jury." *United States v. Tocco*, 200 F.3d 401, 420-21 (6th Cir.), *cert. denied*, 539 U.S. 926 (2003).

We "will not overturn a verdict unless the prosecutorial misconduct is 'so pronounced and persistent that it permeate[d] the entire atmosphere of the trial, . . . or so gross as probably to prejudice the defendant.'" *Id*. at 421 (quotation omitted); *Mason v. Mitchell*, 320 F.3d 604, 635 (6th Cir. 2003). "[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Young*, 470 U.S. 1, 11 (1985).

We conclude that the district court did not abuse its discretion by denying the motion for mistrial based on Cook's statement. We appreciate that Cook personally acknowledged at oral argument that his statement was inappropriate. Although it was improper for Cook to insinuate that Davis would not have been prosecuted (as Bolden was not) if he was not truly guilty, the district court did not abuse its discretion by denying the motion for a mistrial because the statement was not flagrant and the district court immediately gave a cautionary instruction.

Davis was prejudiced by the inference that he would not have been charged, as Bolden was not, if the prosecutor had known him to be innocent. Also, the evidence against Davis centered on his possession (or constructive possession) of cocaine; Cook's statement may have improperly influenced the jury to believe that if there were any doubt about whether the cocaine belonged to Davis, the young women (Ranisha Ewing and Geisha Bolden) would be going through criminal proceedings as well. In addition, the young women were the only witnesses who could testify as to the possession issue of August 24, 2005. However, Cook's statement was isolated and not deliberate.[3] In addition, the district court immediately instructed the jury "to disregard any comments just made by Mr. Cook in response to Mr. Oldham's questions" and repeated this instruction twice later in the trial as well. J.A. at 28-29 (Mem. & Order at 6-7); J.A. at 271-72, 277-78 (Trial Tr. at 136:14-137:2, 142:16-143:3). Based on the foregoing, we conclude that, although Cook made an improper statement, there is no basis for us to hold that the district court abused its discretion by not declaring a mistrial.

## V. PLAIN-ERROR REVIEW

### A. Standard of Review

"[P]rosecutorial misconduct may be so exceptionally flagrant that it constitutes plain error, and is grounds for reversal even if the defendant did not object to it." *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001) (quoting *United States v. Carroll*, 26 F.3d 1380, 1385 n.6 (6th Cir. 1994)). As the Supreme Court has held, "[t]he plain-error doctrine of Federal Rule of Criminal Procedure 52(b) tempers the blow of a rigid application of the contemporaneous-objection requirement." *Young*, 470 U.S. at 15 (footnote omitted). Rule 52(b) states: "A plain error that affects substantial rights may be considered even though it was not brought to the court's attention." FED. R. CRIM. P. 52(b).

> The Rule authorizes the Courts of Appeals to correct only "particularly egregious errors," those errors that "seriously affect the fairness, integrity or public reputation of judicial proceedings." In other words, the plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."

---

[3] Indeed, his initial response to defense counsel's fourth instance of questioning the witness about the prosecution of Ewing was to raise an objection: "Objection. Asked and answered. There is no prosecution. It has been established and covered and covered and covered." J.A. at 270 (Trial Tr. at 135:5-7). Cook's frustration is palpable, and we find it difficult to label his improper statement that followed as "deliberately" said, as opposed to being said inappropriately in frustration.

*Young*, 470 U.S. at 15 (citations omitted). To show plain error, "there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" *United States v. Bailey*, 488 F.3d 363, 368 (6th Cir.) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997) (alteration in original) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993))), *cert. denied*, – U.S. –, 128 S. Ct. 507 (2007). "Generally, an error does not affect substantial rights unless it is prejudicial–in other words, the error 'must have affected the outcome of the district court proceedings.'" *Id.* (quoting *Olano*, 507 U.S. at 734). If the defendant establishes the first three conditions, then "an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* (quoting *Johnson*, 520 U.S. at 467 (alteration in original) (internal quotation marks omitted) (quoting *Olano*, 507 U.S. at 732)).

### B. Non-Contemporaneous Objections to Alleged Prosecutorial Misconduct

We conclude that, because the plain-error doctrine of Rule 52(b) should be used only to correct particularly egregious errors, the three allegedly improper statements made by the prosecution that defense counsel challenged on appeal (but did not contemporaneously object to during the trial) do not result in plain error. Even if each statement at issue met the first three parts of the *Olano* analysis, each fails to meet the fourth part.

First, defense counsel raises for the first time on appeal prosecutor Plowell's statements during closing argument regarding the confusion of government witness Ewing. Viewed from the perspective of the transcript as a whole, Plowell's statements aimed to summarize the confusion that ensued when Ewing took the stand; she attempted to rehabilitate Ewing by inferring from the facts presented that the witness did not have a reason to lie because she had not been given a "deal." *See Carter*, 236 F.3d at 784 ("[C]ounsel has the freedom at trial to argue reasonable inferences from the evidence . . ."). Plowell's efforts to argue for Ewing's credibility when the defense counsel stated during the trial that Ewing was receiving something from the government in exchange for her testimony may have stepped over the line of zealous advocacy by insinuating what the prosecutor's personal beliefs were, but her statements were not plain error so egregious that the "fairness, integrity or public reputation" of the proceeding were affected. *See Young*, 470 U.S. at 15 (citation omitted). The prosecutor did not offer her personal opinion based on facts that were not before the jury. *See United States v. Brennan*, 326 F.3d 176, 183 (3d Cir.), *cert. denied*, 540 U.S. 898 (2003). Therefore, we decline to find plain error warranting reversal based on this comment.

Second, Cook's statement during closing argument regarding Gilreath and Fortner, two of the officers involved in this case, responded to defense counsel's insinuations during trial that Gilreath and Fortner would lie or fabricate evidence. *See* J.A. at 226, 230, 308-11, 314 (Trial Tr. at 91:3-17, 95:11-15, 173:1-176:22, 179:2-25). Cook stated that it was "offensive" for defense counsel to argue that public servants who "risk their lives every day" would fabricate evidence or lie. J.A. at 819 (Trial Tr. at 47:1-8). Although these statements may have been in error, they were not so "egregious" that they affected the "fairness, integrity or public reputation" of the proceedings as a whole. *Young*, 470 U.S. at 15 (quotations omitted).

Finally, we have held previously that a prosecutor's use of the term "predator" in reference to a defendant does not deprive the defendant of a fair trial in certain circumstances. *Byrd v. Collins*, 209 F.3d 486, 536 (6th Cir.) (holding that the defendant was not deprived of a fair trial under the circumstances despite the fact that the prosecutor referred to the defendant as a predator three times during closing argument), *cert. denied*, 531 U.S. 1082 (2001). Although Cook may have inappropriately insinuated what his personal assessment was of Davis's character, he reminded the jury immediately that it was their "job to make credibility determinations." J.A. at 821 (Trial Tr. at 52:6-12). Based on the foregoing, we conclude that this was not an error so egregious that a "miscarriage of justice" would result from the comment.

## VI. CONCLUSION

First, because the officers involved formed a reasonable and articulable suspicion before approaching Davis on both March 9, 2005 and August 24, 2005, we **AFFIRM** the district court's denial of Davis's motion to suppress the evidence of illegal drug activity found on both those occasions. Second, although the prosecutor violated Federal Rule of Criminal Procedure 16(a)(1)(G), we **AFFIRM** the district court's ruling because Davis's counsel did not demonstrate that the verdict would have been different if the government had complied with the discovery rules. Third, because the government's statement, to which defense counsel objected during trial, was improper but not flagrant, and the district court provided several cautionary instructions to the jury, we **AFFIRM** the district court's denial of a motion for mistrial based on the statement. Finally, because each of the three statements made by the government to which Davis objects for the first time on appeal do not rise to the level of seriously affecting "the fairness, integrity or public reputation of judicial proceedings," we do not find that the statements constitute plain error. Therefore, we **AFFIRM** the district court's judgment.